**MAGAN WHITE,**

     **Plaintiff,**

**v.**                                  **Case No. 8:19-cv-0003-T-02CPT**

**SHERIFF DAVID GEE, et al.,**

     **Defendants.**
_____/

## <u>ORDER DISMISSING FEDERAL CLAIMS FOR LACK OF SUBJECT MATTER JURISDICTION AND  DECLINING TO  EXERCISE SUPPLEMENTAL JURISDICTION OVER STATE LAW CLAIMS</u>

Plaintiff's newborn baby was badly beaten, with 27 fractures on 12 ribs and massive brain damage.  Dkt. 78-8 at 186.  Plaintiff's parental rights were terminated after a state trial court held a hearing, at which Plaintiff testified with counsel.  The court found Plaintiff did not shelter or care for her baby.  The appellate court affirmed.

Plaintiff sues for damages due to termination of her parental rights.  She blames her incompetent trial counsel, corrupt guardians of the now brain-damaged baby, and a group of law enforcement officers who conspired (for other reasons) against an officer favorable to her.  She admits that in order to prevail, this Court

must rule that both the trial judge and the Florida Second District Court of Appeal were in error. This Court dismisses the case under *Rooker-Feldman*.

This matter came before the Court for a hearing on May 8, 2019, upon Defendants' motions to dismiss the corrected amended complaint.[1] The Court heard extensive argument from counsel on the several defense motions and then received supplemental briefing from all parties[2] on the *Rooker-Feldman* doctrine. As the Eleventh Circuit teaches, "[t]he *Rooker-Feldman* doctrine eliminates federal court jurisdiction over those cases that are essentially an appeal by a state court loser seeking to relitigate a claim that has already been decided in a state court." *Target Media Partners v. Specialty Mktg. Corp.*, 881 F.3d 1279, 1281 (11th Cir. 2018). The doctrine applies here, and Plaintiff's federal claims (Counts I-III and XII-XIII) are dismissed from this Court for lack of federal subject matter jurisdiction pursuant to *Rooker-Feldman*. The Court declines to exercise supplemental jurisdiction over Plaintiff's state law claims in absence of federal jurisdiction. Thus Counts IV-XI and XIV-XVI are dismissed from this Court.

## FACTUAL BACKGROUND

Plaintiff Magan White had a newborn baby boy. While in Plaintiff's sole custody, the infant was beaten horrifically, mauled to within an inch of his life. He

---

[1] The motions are found at Dkts. 52-64. Plaintiff filed written responses to each.
[2] The supplemental briefs are found at Dkts. 81-83.

is now severely brain damaged.  Dkt. 78-8 at 186.  Plaintiff alleges that her live-in

boyfriend was the perpetrator.  Plaintiff contends that a large and devious

conspiracy caused her to lose her parental rights to the infant in the ensuing parental

rights termination proceeding begun by the State, during which Plaintiff was at all

times represented by counsel.

Plaintiff contends that her lawyers were incompetent (Dkt. 49 at 2 n.1; Dkt.

83-1 at 23), and the guardians ad litem appointed for the infant were incompetent or

corrupt for siding with the State (Dkt. 49 at 47-49; Dkt. 83-1 at 12, 23).  Plaintiff

contends that the Circuit Court Judge who terminated her parental rights by final

written Order (Dkt. 78-8 at 182-92)  after several evidentiary hearings erred and that

the ruling was fraudulently induced by the conspiracy set forth in her corrected

amended complaint.   Likewise, appeals to Florida's Second District Court of

Appeal ("Second DCA") foundered and did not correct the corrupted final

judgment.

The corrected amended complaint is the third complaint Plaintiff has filed.

Plaintiff sued 15 defendants in a 16-count conspiracy and racketeering complaint

spanning 97 pages.  The defendants are the present and former State Attorneys for

the Thirteenth Judicial Circuit (Hillsborough County) and two of their Assistant

State Attorneys, as well as the former and present County Sheriffs, several current

and one retired Sheriff's Office deputies, a Sheriff's Office child protection

3

investigator, and the Florida Assistant Attorney General who prosecuted the parental termination case.

Because these proceedings arise on multiple motions to dismiss, the facts as alleged in the complaint are deemed true.[3]  Plaintiff also filed a number of other documents for the Court to review in connection with her responses to the motions to dismiss.  Dkt. 78.

The corrected amended complaint alleges federal racketeering under 18 U.S.C. § 1962 (Counts I-III) and federal civil rights claims under 42 U.S.C. § 1983 (Counts XII-XIII), as well as multiple state law claims (Counts IV-XI and XIV-XVI).  What the federal claims have in common is the injury sought to be recompensed.  As noted in Count I, that injury is:

> As a direct and proximate result of DEFENDANTS' [actionable conduct], [Plaintiff] has been injured in her property, in that she has had her child taken away from her, her parental rights . . . have been severed, she has lost standing to sue [the hospital at which her son was treated] for failing to recognize that [her boyfriend] was beating her baby, and [Plaintiff's boyfriend] walked away from the crime without prosecution . . . .

Dkt. 49 ¶ 265.

The theory of Plaintiff's case is that the Hillsborough County Sheriff's Office (HCSO) and the State's Attorney's Office had a personal vendetta against one

---

[3] Plaintiff referred to several exhibits in the corrected amended complaint. *See, e.g.*, Dkt. 49 at 23-26 n.10.  In the corrected amended complaint, she also asked the Court to take judicial notice of all items docketed in the state court parental rights termination proceedings as well as all items docketed in *Boswell v. Gee*, No. 8:18-cv-1769-T-17AEP (M.D. Fla.).  *See id.* at 2 & n.1.

HCSO Detective named Brian Boswell. According to Plaintiff, Boswell was being wrongly drummed out of the HCSO for various failures to be a "team player" and his refusal to be corrupt. The first line of the corrected amended complaint states that "[t]his case arises out of <u>Boswell v. Gee</u>, 18-cv-1769 (M.D. Fla. July 19, 2018)," which is Boswell's suit pending in this Court before Judge Elizabeth Kovachevich against many of these same parties, seeking recompense for the conspiracy to force Boswell out of the HCSO and to defame him. *Id.* ¶ 1. Indeed, at the May 8, 2019 hearing on Plaintiff's instant complaint, Boswell was present, but Plaintiff was not. Boswell and Plaintiff share lawyers.

The gist of the allegations in the corrected amended complaint is that the conspiracy to "undermine" Boswell and force him out of the HCSO caused the proper investigation of Plaintiff's boyfriend to fall apart. That boyfriend beat Plaintiff's baby. Boswell was investigating this child battery. And Boswell could have exculpated Plaintiff in her parental rights termination hearings had he been aware they were occurring. But Boswell was allegedly misled by Defendant Assistant Attorney General Kenneth Beck that the parental rights termination matter was not going to proceed. As Plaintiff explains it, the conspiracy to "get" Boswell had collateral effects, including the dropping of criminal charges against the boyfriend and the improper focus of attention to the allegedly deficient parenting of Plaintiff.

DISCUSSION

The Court has considered the parties' supplemental briefing and concludes that the *Rooker-Feldman* doctrine precludes it from exercising subject matter jurisdiction over Plaintiff's federal claims. Under the *Rooker-Feldman* doctrine, federal courts do not have jurisdiction to review state court decisions. *May v. Morgan Cty.*, 878 F.3d 1001, 1004 (11th Cir. 2017) (citations omitted). The doctrine is a narrow one and applies only in cases (1) brought by state-court losers (2) complaining of injuries caused by final state-court judgments (3) rendered before the district court proceedings commenced and (4) inviting district court review and rejection of those judgments. *Id.* (citation omitted). The federal claims in this case easily satisfy the first three requirements: Plaintiff is a state-court loser who is complaining about injuries caused when the state court by final judgment terminated her parental rights in 2016 (a decision that was affirmed in 2017, *see In the Interest of A.W.*, 226 So. 3d 828 (Fla. 2d DCA 2017))—long before Plaintiff filed the instant lawsuit.

The Court also concludes that Plaintiff's case invites district court review and rejection of the state court's judgments. Notably, although the *Rooker-Feldman* doctrine is narrow in its application, "a state court loser cannot avoid *Rooker-Feldman*'s bar by cleverly cloaking her pleadings in the cloth of a different claim. Pretext is not tolerated." *May*, 878 F.3d at 1005. To determine whether a claim

6

invites rejection of a state court decision, courts must consider whether a claim was either actually adjudicated by a state court or is "inextricably intertwined" with a state court judgment. *Target Media Partners*, 881 F.3d at 1286 (citation omitted). A claim is "inextricably intertwined" with a state court judgment if it asks to "effectively nullify the state court judgment, or it succeeds only to the extent that the state court wrongly decided the issues." *Id.* (internal quotation and citation omitted). That said, a federal claim is not "inextricably intertwined" with a state court judgment when there was no "reasonable opportunity to raise" that claim during the relevant state court proceeding. *Id.* (citation omitted).

Here, Plaintiff's federal RICO and § 1983 claims are inextricably intertwined with the state court's judgment terminating her parental rights because they can succeed only to the extent that the state court wrongly decided the issues. At the hearing, this Court asked and received the following question and answer:

> **THE COURT**: I mean, basically, I have to determine . . . Judge Tesche was misled or fooled or defrauded into finding the termination unjustly. Isn't that the gist of your complaint?
>
> **Ms. Mattox**: It is.

Transcript of 5/8/2019 hearing at 7. As Plaintiff's counsel informed the undersigned:

> **THE COURT**: So you want me to find that Judge Tesche's findings were fraudulently induced?
>
> **Ms. Mattox**: That is absolutely what happened.

*Id.* at 16.

> **THE COURT**:  So not only do I have to conclude that Judge Tesche was wrong for whatever reason . . . , I have to conclude the Second District Court of Appeal's per curiam affirmance [of J. Tesche] was wrong.  Because they affirmed the arresting of the child from your client.

> **Ms. Mattox**:  On the fraudulent information that was submitted by the Defendants, yes.

*Id.* at 18.  Thus, Plaintiff asks the Court to reject not only the trial court's final order, but also the appellate court's affirmance.

Plaintiff's lawyer also clearly conceded that Plaintiff's relief requires review of the state court final judgment and requires the undersigned to conclude the state court erred.  As noted at the hearing on the motion to dismiss:

> **THE COURT**:  So the injury that your client – Ms. White's injury is caused . . . it's caused the fact that the child was taken from her and damages stem from the fact that the child was arrested from her, unjustly, under your theory?

> **Ms. Mattox**:  That would be accurate, Your Honor, the deprivation of her parental rights.

> **THE COURT**:  So in order to award compensation for that injury, we have to conclude that the order was wrong, Judge Tesche's order was wrong.  Because if it's right, and she deserved to have the child taken, then you're not damaged at all by all of this conspiracy?  I mean isn't that correct?

> **Ms. Mattox**:  Yes, sir, it would be . . . .

> ***

**THE COURT**: Okay. And not to beat a dead horse. But if the judge was right, then you have not injury, right? If Judge Tesche rightfully, and as a matter of justice, terminated those parental rights, then you're not injured?

**Ms. Mattox**: Yes, sir . . . .

*Id*. at 6-7. Plaintiff's lawyer candidly agreed with the undersigned that "in order for [Plaintiff] to have relief then I need to determine that that adjudicator – those facts that were adjudicated [by the state trial judge] were wrong." *Id*. at 26. This is an admission that this case is inextricably intertwined with the state court judgment.

And even if Plaintiff's counsel had not made these concessions, the record supports the conclusion that this case is inextricably intertwined with the state court judgment. The state court, after reviewing the evidence presented to it, including Plaintiff's testimony, concluded that Plaintiff endangered her child, explaining in relevant part:

> The Mother admitted that from Thursday to Saturday that she had changed the Child's diaper and had bathed him, thereby having been in the position to notice his changed condition and to seek medical attention more quickly. The Mother never took the Child to the doctor despite her concerns as she believed the Child's lethargic behavior [was] the results of gas drops he was given . . . . In such a massive brain injury one would decompensate very quickly. It would not take even one day. The baby would have been very lethargic, would experience seizures and would have a hard time breathing. This Child had all these symptoms for at least two days as described by the Mother's own testimony. After suffering this massive neurological insult, the expert opined that Child would be cold; his feet and hands would be cold to the touch and his color would be turning bluish. As a result of the inflicted trauma, the Child's brain was so swollen that his central nervous system was not working correctly. The Child was not

responding to pain. These symptoms could be noticeable as early as
one hour from the onset of the trauma.

Dkt. 78-8 at 185-87.[4] If the state court was correct that Plaintiff endangered her

child by neglecting his injuries, then Plaintiff could not have been harmed by the

anti-Boswell conspiracy alleged in her corrected amended complaint. Likewise, if

the state court had not—in Plaintiff's view—erred[5] by finding that she endangered

her child, Plaintiff would not have suffered any of the damages alleged in her

federal claims. Thus, as her counsel stated, Plaintiff's federal claims can succeed

only if both the state trial and appellate courts were wrong, satisfying the first

requirement for being "inextricably intertwined."

---

[4] As noted above, Plaintiff presented a number of documents to the Court to consider in connection with the motions to dismiss. Indeed, the operative complaint (Dkt. 49) expressly asks for judicial notice.

[5] In their supplemental brief, the HCSO Defendants claim that Plaintiff "does not allege that the state court wrongfully decided her case" but instead that her "parental rights were terminated, based on falsehoods and lies presented to the court, as well as the failure to provide Det. Boswell's favorably exculpatory testimony." Dkt. 81 at 3 (internal quotation omitted). This is a distinction without a difference. Plaintiff contends that the state court erroneously found that she endangered her child because Defendants presented falsehoods to the state court and failed to provide Boswell's testimony—which is still a claim that the state court erred when it found that she endangered her child. In similar situations, the Eleventh Circuit has found the federal court claims to be inextricably intertwined with the relevant state court judgment. *See Goodman ex rel. Goodman v. Sipos*, 259 F.3d 1327, 1330, 1334 (11th Cir. 2001) (finding § 1983 claim inextricably intertwined with state court custody decision where plaintiff claimed, in part, that one of the defendants presented an affidavit to the state court that was intentionally or recklessly false and that the affidavit ultimately formed the basis of the state court's custody decision); *Scott v. Frankel*, 562 F. App'x 950, 953-54 (11th Cir. 2014) (affirming dismissal of claims for damages under *Rooker-Feldman* doctrine where the plaintiff alleged that the defendants colluded to omit material facts from a report that ultimately formed the foundation of the Florida Supreme Court's decision to suspend the plaintiff from the practice of law; finding that the plaintiff's damages claim could succeed only to the extent the Florida Supreme Court wrongly decided the issues when it suspended the plaintiff's license to practice law).

That this case is inextricably intertwined – indeed identical – to the child termination case can be seen by Plaintiff's recent action. Well after the final order (of November 1, 2016) was affirmed (on May 31, 2017), Plaintiff filed on March 5, 2019 a "Motion to Reopen Termination of Parental Rights" before the state trial court. Dkt. 78-5. The very first sentence, line, paragraph, and exhibit in the statement of facts to this state court Motion to Reopen refer to the original complaint in the present federal suit. *Id.* at 3. Plaintiff also attaches the original complaint from the instant federal lawsuit to the Motion to Reopen as pertinent facts "as explained in detail" therein. *Id.* at 3, 61-155. Likewise, as part of the facts in Plaintiff's appellate brief on the denial of the motion to reopen, Plaintiff refers to her federal court complaint. Dkt. 83-1 at 13.[6] By these filings, Plaintiff has shown that the instant case is not just factually intertwined with the state court case but is factually identical.

In her supplemental brief, Plaintiff contends that her federal claims are not inextricably intertwined with the state court judgment because she is "not seeking to have the instant federal court restore her parental rights." Dkt. 83 at 3. Instead, she argues, she is merely seeking damages, which she could not have received in the state court proceeding. *Id.* But the Eleventh Circuit has rejected this argument in a

---

[6] The trial court denied this motion to reopen, and this denial is now apparently on appeal to the Second DCA. Transcript of 5/8/2019 hearing at 4; Dkt. 83-1. Plaintiff has presented to the Second DCA on appeal the complaint in this instant case. The fraudulent machinations alleged in this instant federal case are now under presentment to the Second DCA. Tr. at 19-20.

case with very similar facts. In *Goodman*, 259 F.3d at 1333, the plaintiffs brought §

1983 claims for damages caused in connection with a proceeding to remove a child

from a mother's custody. The plaintiffs argued that their § 1983 claims were not

"inextricably intertwined" with the state court judgment because they were seeking

damages, not injunctive relief preventing enforcement of the state court judgment

and returning custody to the plaintiff. The Eleventh Circuit rejected that argument,

reasoning, "[O]ur decisions focus on the federal claim's relationship to the issues

involved in the state court proceeding, instead of the type of relief sought by the

plaintiff." *Id.*

The Court also concludes that Plaintiff had a reasonable opportunity to raise

her claims in the state court proceeding. Plaintiff was at all times represented by

counsel. Plaintiff certainly knew of Detective Boswell as he investigated the child

battery and interviewed her. There is no indication that Plaintiff's lawyers

subpoenaed Boswell or sought to interview him. Boswell, of course, had no

personal knowledge of any of the events. The Court recognizes that Plaintiff

contends she did not learn about the anti-Boswell conspiracy until after the state

court proceeding had concluded (and discusses the point further, *infra*), but there is

no indication that the state court could not have considered Plaintiff's arguments

about the anti-Boswell conspiracy had she known about it at the time. Indeed,

Plaintiff filed the motion to reopen asking the state court to reopen her case based, in

part, upon newly discovered "Boswell conspiracy" evidence and alleged misconduct by a party due to withholding of "exculpatory *Brady* material." Dkts. 78-5 through 78-8.

In that motion to reopen, she made essentially the same arguments posited by her corrected amended complaint, including the claims that the anti-Boswell conspiracy caused inappropriate negative attention to be focused on her parenting, led to false information being included in the initial petition for termination of parental rights presented to the state court, and resulted in Boswell's exculpatory testimony being withheld from the state court and Plaintiff's counsel. This argument, plus citing and attaching her original federal complaint to the motion as Exhibit A to the "Facts" section (Dkt. 78-5 at 61-155), is sufficient to show that the state court had the ability to consider the issues raised in this federal action. *See Goodman*, 259 F.3d at 1334 (concluding that plaintiffs had a reasonable opportunity to raise constitutional challenges in state court custody proceeding because they were parties to and participated in the proceeding and the state court had the ability to hear their constitutional arguments).

In her supplemental brief, Plaintiff does not explicitly argue that she had no reasonable opportunity to raise her claims in the state court proceeding.[7] She does

---

[7] Likewise, the HCSO Defendants state in conclusory fashion that Plaintiff had no reasonable opportunity to raise her claims in the state court proceeding, but they do not explain why. Dkt. 81 at 2-3, 4.

note, however, that to recover damages she had to file an action separate and apart from the dependency proceeding, which does not allow for recovery of damages. But having a "reasonable opportunity to raise" a claim during the relevant state court proceeding does not require that the federal-court plaintiff could have asserted a stand-alone damages claim in the state court action. For example, in *Goodman*, the plaintiffs brought § 1983 claims in federal court for damages allegedly suffered in connection with a child custody proceeding. As in this case, the *Goodman* plaintiffs presumably could not have asserted a § 1983 counterclaim in the child custody proceeding. Nonetheless, the Eleventh Circuit found that the plaintiffs had a reasonable opportunity to raise their claims in state court because state law permitted constitutional challenges to a juvenile court's orders to be brought in juvenile court. *Goodman*, 259 F.3d at 1334.

Similarly, in *Uberoi v. Supreme Court of Florida*, 819 F.3d 1311 (11th Cir. 2016), the plaintiff sued the Florida Supreme Court in federal court after her application for admission to the Florida Bar was denied. She alleged, in part, that the Florida Supreme Court's decision violated 11 U.S.C. § 525(a), which prohibits governmental units from discriminating against a person solely because that person is a federal bankruptcy debtor. *Id.* at 1312. Again, the plaintiff presumably could not have brought a claim under 11 U.S.C. § 525(a) in the Florida Supreme Court proceeding related to her bar application. Nonetheless, the Eleventh Circuit found

that she had the opportunity to raise her claims before the state court, reasoning, "[T]he . . . allegations about her financial irresponsibility and bankruptcy [made by the Florida Board of Bar Examiners] gave her the opportunity to argue, either in her written answer or at the formal hearing (or both), that it was improper for the Board to consider her bankruptcy filing." *Id.* at 1313 (citation omitted).

Similar to the plaintiffs in *Goodman* and *Uberoi*, Plaintiff was a party to the state court proceeding, was represented by counsel, and (with the exception of a hearing she failed to attend) appears to have participated fully in that proceeding, including multiple evidentiary hearings. She had notice that she was being accused of endangering her child and had the opportunity to raise any and all arguments and evidence to counter that accusation, which is ordinarily enough for *Rooker-Feldman* purposes.

That leaves Plaintiff's claim that she did not learn about the anti-Boswell conspiracy until she was contacted as potential witness in *Boswell v. Gee*, [8] a case filed in 2018. Dkt. 49 at 5 n.6. The Court will assume for the sake of argument that this means that Plaintiff could not have learned about Boswell and his allegedly exculpatory testimony before 2018 because Defendant Beck somehow acted wrongly in keeping Boswell from testifying in the state court proceeding and the

---

[8] As noted above, Boswell is suing the sheriff and others in that case for an alleged career-ending conspiracy. Boswell's lawyers in that case represent Plaintiff White here.

anti-Boswell conspiracy generally left Plaintiff in the dark as to what was really happening.[9]  This amounts to a claim of extrinsic fraud—that is, fraud that keeps a person from knowing about or asserting their rights.  *See Valentine v. BAC Home Loans Servicing, L.P.*, 635 F. App'x 753, 757 (11th Cir. 2015) (citation omitted).[10] But the Eleventh Circuit has never recognized an extrinsic fraud exception to *Rooker-Feldman* and has affirmatively declined to do so.  *See Scott v. Frankel*, 606 F. App'x 529, 532 & n.4 (11th Cir. 2015) (refusing to recognize extrinsic fraud exception to *Rooker-Feldman* and affirming dismissal on *Rooker-Feldman* grounds where plaintiff alleged a wide-ranging conspiracy to silence his criticism of a federal agency by, among other things, having his license to practice law suspended).[11]

---

[9] This is, the Court notes, a questionable proposition.  At the hearing, Plaintiff's counsel admitted that Plaintiff was represented by counsel and there was nothing that prevented her counsel from contacting Boswell as a potential witness in the state court proceeding.  And Plaintiff's own complaint alleges that Boswell interviewed her in the course of the criminal investigation of her boyfriend, so Plaintiff, at least, knew that Boswell existed and what she told him.  Dkt. 49 ¶¶ 67-75.  The parties also agreed during the hearing that discovery—including depositions—would have been available in the state court proceeding.  Presumably lawyers would take depositions of witnesses with firsthand, or personal, knowledge.  Boswell was not such a witness.

[10] In this Order, unpublished decisions of the Eleventh Circuit are cited as persuasive authority.

[11] Arguably, Plaintiff's complaint that Defendants caused false information to be included in the initial petition for termination of parental rights amounts to a claim of intrinsic fraud—that is, fraud that pertains to an issue involved in a judicial proceeding, such as fabricated evidence and perjured testimony.  *See Valentine*, 635 F. App'x at 757.  To the extent it does, the Court notes that there is no intrinsic fraud exception to *Rooker-Feldman*.  *Id.* ("Such an exception could effectively gut the [*Rooker-Feldman*] doctrine by permitting litigants to challenge almost any state-court judgment in federal district court by merely alleging that the other party lied during the state-court proceedings.").

Ultimately, Plaintiff's federal claims are among those barred by the *Rooker-Feldman* doctrine. For her to succeed on those claims, as Plaintiff's counsel concedes, this Court would have to find that the state court ruled erroneously when it found that she endangered her child and terminated her parental rights. In addition, Plaintiff had a reasonable opportunity to raise the claims she pursues in this case in the state court proceeding. Moreover, advised by counsel, she testified at a full and fair final evidentiary hearing. Accordingly, the Court lacks subject matter jurisdiction over Plaintiff's federal claims, and they must be dismissed.

## CONCLUSION

For the reasons stated above, the Court concludes that the *Rooker-Feldman* doctrine bars it from exercising subject matter jurisdiction over Plaintiff's federal claims. Thus, Counts I, II, III, XII, and XIII of the corrected amended complaint (Dkt. 49) are dismissed from federal court for lack of federal subject matter jurisdiction.

As to the state law claims, the corrected amended complaint does not assert a jurisdictional basis for those claims. Given that most (if not all) of the parties appear to be based in Florida, the Court presumes that Plaintiff must be asking the Court to invoke its supplemental jurisdiction under 28 U.S.C. § 1367. Under § 1367(c)(3), a district court may decline to exercise supplemental jurisdiction if it has dismissed all claims over which it has original jurisdiction, as has occurred here.

Dismissal of state law claims is "strongly encouraged" where the federal claims are dismissed prior to trial.  *See Farquharson v. Citibank, N.A.*, 664 F. App'x 793, 798 (11th Cir. 2016) (citing *Baggett v. First Nat'l Bank of Gainesville*, 117 F.3d 1342, 1353 (11th Cir. 1997)).  Accordingly, the Court declines to exercise supplemental jurisdiction over Plaintiff's state law claims (Counts IV-XI and XIV-XVI).  They are dismissed from this Court as dehors federal jurisdiction.  The motions to dismiss (Dkts. 52, 53, 54, 55, 56, 57, 58, 59, 60, 61, 62, 63, and 64) are granted.  The Clerk is directed to terminate any pending motions/deadlines and to close the case.

     **DONE AND ORDERED** at Tampa, Florida, on June 13, 2019.


                    */s/ William F. Jung*
                    **WILLIAM F. JUNG**
                    **UNITED STATES DISTRICT JUDGE**


**COPIES FURNISHED TO:**
Counsel of Record